SETA, Appellant,

v.

**READING ROCK, INC., Appellee.**

[Cite as *Seta v. Reading Rock, Inc.* (1995), 100 Ohio App.3d 731.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA94–06–141.

Decided Feb. 27, 1995.

*Forg & Forg* and *John H. Forg III*, for appellant.

*Berlon & Timmel* and *Mark J. Huller*, for appellee.

WALSH, Judge.

Plaintiff-appellant, Katherine Seta, appeals an order of the Butler County Court of Common Pleas overruling her motion for summary judgment and granting summary judgment in favor of defendant-appellee, Reading Rock, Inc. ("Reading").

On July 28, 1986, appellant was hired by Reading as a general accountant. Prior to being hired, appellant completed and signed an employment application that stated in part: "I understand and agree that my employment is for no definite period and may, regardless of the date of payment of my wages and salary, be terminated at any time without any previous notice." Appellant also received a copy of Reading's Employee Handbook of Company Policy/Practices/Benefits ("employee handbook"), which stated in relevant part:

"Dismissal is the sternest form of discipline and generally is resorted to only in serious cases or when the other efforts fail to correct the conduct of the employee.

"There are, however, certain causes that call for dismissal without prior warning. Among typical causes of such action are:

" * * *

"4. Possession or use of illicit drugs or narcotics."

In 1992, Reading decided to implement a formal drug/alcohol screening policy ("policy"). In preparation for the implementation of the policy, all Reading personnel were invited to a drug awareness seminar. In addition, a book entitled "Americans for a Drug Free America," containing substance abuse information, was mailed by Reading to each employee's home before the plan went into effect.

On September 8, 1992, during a meeting of all employees, Reading formally announced the introduction of its policy, which was to take effect on October 15, 1992. During that meeting, employees were encouraged to seek assistance or counseling if they were currently using illicit drugs. Employees were also

informed that there would be no disciplinary action taken against them if they sought counseling before they were tested. Reading offered to pay for the counseling of any person who wanted or needed it. At no time did appellant request counseling or assistance. Appellant received a copy of Reading's policy, which provides in relevant part:

"*PURPOSE*

" * * *

"*Reading Rock will not employ anyone who screens 'positive' for illegal drugs* * * *. [Emphasis added.]

"*ALCOHOL AND ILLEGAL DRUG WORK RULES*

"1. No employee may report to work under the influence of alcohol or illegal drugs.

"2. No employee may use, sell, distribute, possess, or receive any alcohol or illegal drug while at work, on Company property, in a Company vehicle, or on customer property.

"3. No employee may refuse to submit to a Company-requested test or screening for alcohol or illegal drugs.

" * * *

"*VIOLATIONS*

"Violations of the previous section are subject to discipline up to and including discharge, at the discretion of the Company, on a case-by-case basis. It is the responsibility of each employee to seek assistance before alcohol and drug problems lead to disciplinary action.

" * * *

"*EMPLOYEE SCREENING FOR ALCOHOL AND ILLEGAL DRUGS*

"Effective October 15, 1992 Reading Rock will utilize random drug and blood alcohol testing to ensure compliance with its drug and alcohol policy. The company reserves the right to request drug and blood alcohol testing after an employee is involved in a work site or vehicular accident, when an employee is using or is under the influence of drugs, alcohol or other intoxicating substances on Company or customer premises or time, before clock-in following a three day layoff, or at the request of the Company. *Any employee* who refuses to submit to drug and/or blood alcohol testing upon the Company's request, or *who fails the test, is subject to disciplinary action, up to and including termination.* [Emphasis added.]

*"INTERPRETATION*

"The Company shall have the exclusive right to interpret and apply this policy and to decide any matters arising under this policy. * * * The Company reserves the right to modify this policy at any time."

On October 1, 1992, appellant signed an Employee Acknowledgment form, stating that appellant had received, read, understood and agreed to comply with the policy.

On December 3, 1992, Reading conducted a random drug and alcohol test of all its employees. The test was administered by Mercy Business Connection/Mercy Medi–Center. The urine specimens were analyzed by Roche Medical Laboratories. Fourteen employees, including appellant, tested positive for illicit drugs. Prior to the testing, Reading had made a corporate decision that any employee who tested positive would be discharged. Appellant was discharged on December 15, 1992. The other thirteen employees were discharged as well.

On May 28, 1993, appellant filed suit alleging several claims against Reading in the trial court. On December 13, 1993, appellant's deposition was taken. During her deposition, appellant admitted smoking marijuana. Appellant testified that during the five-year period before she was tested in 1992, she would smoke marijuana on the average of ten times a month. Appellant further testified that the last time she smoked marijuana before Reading's random drug test was the weekend before October 15, 1992. Appellant testified that she smoked marijuana on six or seven occasions during the course of that weekend. On March 30, 1994, Reading filed a motion for summary judgment. On April 25, 1994, appellant filed a cross-motion for summary judgment. On May 25, 1994, the trial court granted Reading's motion for summary judgment, dismissing all of appellant's claims. An amended order sustaining Reading's motion for summary judgment (correcting a typographical error) was entered on June 3, 1994.

Appellant timely filed this appeal and raises the following assignments of error:

"Assignment of Error No. 1:

"The trial court erred in holding that the drug policy did not create a contract right altering Seta's status as an employee-at-will and that she was terminated in violation of such a contract right.

"Assignment of Error No. 2:

"The trial court erred in holding that Seta did not rely to her detriment upon the drug policy by altering her off-premises, off-duty activities to accord with the drug policy.

"Assignment of Error No. 3:

"The trial court erred in holding that Seta's off-premises, off-duty activities were not entitled to protection from unwarranted intrusion the [*sic*] through urinalysis screeing [*sic*] under the drug policy.

"Assignment of Error No. 4:

"The trial court erred in holding that Reading Rock's disclosure of Seta's 'positive' test for cannaboids in the drug testing conducted on December 3, 1992, to Gramza constitutes an unwarranted invasion of Seta's privacy.

"Assignment of Error No. 5:

"The trial court erred in overruling Seta's motion to strike the affidavit of James T. Lutz, M.D."

Because appellant's first and second assignments of error concern appellant's at-will employment status, we will consider appellant's first two assignments of error together. In these assignments of error, appellant contends that Reading's adoption of its policy and appellant's reliance on the policy altered her at-will employment status. We disagree.

 Under Ohio law, an employment relationship, absent an agreement to the contrary, is regarded as an employment at will which can be terminated at any time by the employer. *Fawcett v. G.C. Murphy & Co.* (1976), 46 Ohio St.2d 245, 75 O.O.2d 291, 348 N.E.2d 144. Ohio courts have, however, recognized two exceptions to the employment-at-will doctrine. Employee handbooks, company policy, and oral representations may give rise to implied contractual provisions that alter the terms of an oral at-will employment relationship. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 104, 19 OBR 261, 264–265, 483 N.E.2d 150, 154. An employer's right to discharge an employee may also be limited by representations or promises made to the employee which fall within the doctrine of promissory estoppel. *Id.*

Under her first assignment of error, appellant argues that Reading's policy, which she describes as being an entirely separate document from the employee handbook and giving rise to entirely separate employment rights, creates an implied contract of employment. Appellant first contends that the policy, which outlines disciplinary rules and procedures, implicitly promised that employees who obeyed the policy's alcohol and illegal drug work rules would retain their employment. Appellant further contends that her continued employment after the policy went into effect constituted the necessary consideration to support an employment contract.

 Under the implied contract exception to employment at will, the provisions of an employee handbook will alter the terms of an at-will employment relationship only if the employer and the employee have agreed to create a

contract from the writing. *Tohline v. Cent. Trust Co.* (1988), 48 Ohio App.3d 280, 282, 549 N.E.2d 1223, 1226–1227. Both parties to an employment-at-will agreement must expressly agree to modify the employment relationship. *Humphreys v. Bellaire Corp.* (S.D.Ohio 1991), 764 F.Supp. 489, 493. In the absence of mutual assent, a handbook is simply a unilateral statement of rules and policies that creates no obligations or rights. *Tohline, supra,* 48 Ohio App.3d at 282, 549 N.E.2d at 1226–1227.

■ Upon review of the record, we find that Reading's policy was simply an elaboration and the implementation of Reading's employee handbook, which expressly lists the use of illicit drugs as a cause for dismissal without prior warning. First, the existence of Reading's policy in and of itself does not alter the employment-at-will relationship. Such a system of discipline does not give the employee a contract right to remain employed unless the employee disobeys the rules: both employer and employee retain the right to terminate the employment for any or no reason. See *Peters v. Mansfield Screw Mach. Prod. Co.* (1991), 73 Ohio App.3d 197, 200–201, 596 N.E.2d 1071, 1073–1074. Second, the provision in Reading's policy that "the Company reserves the right to modify this policy at any time" implies that the disciplinary rules and procedures are not perpetual, but subject to whatever revision and amendment Reading deems appropriate. Given such unpredictability, it seems incongruous that Reading's policy could provide the basis for an implied contract of employment. See *Pyle v. Ledex, Inc.* (1988), 49 Ohio App.3d 139, 145, 551 N.E.2d 205, 211. Finally, appellant's continued employment after the policy went into effect did not alter her at-will status. There is no evidence of new or additional consideration given by appellant after Reading's adoption of the policy. The consideration for appellant's continued employment was the paychecks she received. We therefore find that Reading's policy did not give rise to an implied contract of employment. Appellant's first assignment of error is overruled.

Under her second assignment of error, appellant argues that summary judgment should not have been granted on her promissory estoppel claim. Appellant claims that Reading's policy contained the promise that no employee would be terminated except in strict compliance with the policy terms which, according to appellant, do not include off-work drug activities as a cause for discharge, and that she detrimentally relied on such promise by stopping the use of drugs after the policy went into effect.

■ Promissory estoppel applies to at-will employment agreements if the employer should have reasonably expected the employee to rely on its representations or promises, and if the expected action or forbearance actually resulted and was detrimental to the employee. *Mers, supra,* paragraph two of the syllabus. We find that promissory estoppel does not apply in the case at bar.

First, an employer's threat to discharge an employee for violating disciplinary rules cannot be construed as a promise of job security if the rules are observed. Simply obeying the rules does not guarantee continued employment. In addition, the fact that certain acts are identified in Reading's policy as conduct that might lead to discharge does not indicate that these acts are the exclusive permissible grounds for discharge, especially in light of the language that "Reading Rock will not employ anyone who screens 'positive' for illegal drugs * * *." Second, we fail to see how appellant's reliance on the policy and her stopping the use of drugs was detrimental to her. As the trial court appropriately put it, "such forbearance did not act to her detriment, but to her benefit. It not only contributed to her good health, but also could very well have kept her out of jail * * *." Appellant's second assignment of error is overruled.

Because appellant's third and fourth assignments of error concern invasion of privacy, we will consider these two assignments of error together. In these assignments of error, appellant contends that Reading violated her right to privacy on two occasions. The Supreme Court of Ohio first recognized a cause of action for invasion of privacy in *Housh v. Peth* (1956), 165 Ohio St. 35, 59 O.O. 60, 133 N.E.2d 340, paragraph two of the syllabus:

"An actionable invasion of the right of privacy is the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities."

Under her third assignment of error, appellant argues that Reading's mandatory drug testing constituted an invasion of privacy. Appellant also argues that her dismissal was in violation of public policy protecting that right to privacy. We disagree.

We first find that Reading's mandatory drug testing did not constitute an invasion of privacy. In *Groves v. Goodyear Tire & Rubber Co.* (1991), 70 Ohio App.3d 656, 591 N.E.2d 875, the Auglaize County Court of Appeals, dealing with a similar claim of invasion of privacy as a result of a drug test, held that drug testing by employers did not constitute an actionable invasion of an employee's right to privacy. *Id.* at 662, 591 N.E.2d at 878. In so ruling, the court of appeals relied on 62A American Jurisprudence 2d (1990) 683, Privacy, Section 61, which provides that "[t]he courts appear to be supportive of employers' attempts to create a safe working environment by holding that drug-testing does not constitute an invasion of the employees' common law right to privacy." *Id.* The logic of that statement appeals to us. Appellant contends, however, that the case at bar is governed by *Skinner v. Ry. Labor Executives' Assn.* (1989), 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639. Appellant cites *Skinner* for the proposition that

employer drug testing must pass a balancing test in which the employer's interest in its drug policy must be weighed against the employees' privacy concerns. *Skinner,* however, involved a Fourth Amendment violation claim. We therefore hold that the reasoning and the holding of *Skinner* are not applicable to the case at bar.

We further find that appellant's discharge did not violate public policy. "Public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute * * *." *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, paragraph one of the syllabus. Public policy may also warrant an exception to the employment-at-will doctrine when the discharge is "of equally serious import as the violation of a statute." *Shaffer v. Frontrunner, Inc.* (1990), 57 Ohio App.3d 18, 566 N.E.2d 193, paragraph two of the syllabus. In the case at bar, appellant's discharge did not violate any statute. Nor can we say that a discharge for screening positive for illegal drugs is "of equally serious import as the violation of a statute," especially when appellant had adequate notice from the inception of her employment of Reading's stance against the use or possession of illegal drugs. Appellant's third assignment of error is therefore overruled.

Under her fourth assignment of error, appellant argues that Reading's disclosure to Janet Gramza, a former employee of Reading and a friend of appellant, of appellant's discharge for failing a drug test constituted an invasion of privacy. We disagree.

Appellant's claim falls within *Housh*'s second theory of invasion of privacy, "the publicizing of one's private affairs with which the public has no legitimate concern," also called the "publicity" tort. In order for appellant to state a claim for which relief can be granted under this cause of action:

"(1) there must be publicity, *i.e.,* the disclosure must be of a public nature, not private; (2) the facts disclosed must be those concerning the private life of an individual, not his public life; (3) the matter publicized must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; (4) the publication must have been made intentionally, not negligently; and (5) the matter publicized must not be a legitimate concern to the public." *Killilea v. Sears, Roebuck & Co.* (1985), 27 Ohio App.3d 163, 27 OBR 196, 499 N.E.2d 1291, syllabus.

"Publicity," as used in the first prong, means "communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to 'publica-

tion' [as used in defamation cases and] meaning any communication by the defendant to a third person." *Id.* at 166, 499 N.E.2d at 1294.

Gramza stated in her affidavit that one week after appellant's discharge, she (Gramza) called Reading and asked to speak with appellant. The Reading telephone receptionist, who was aware that Gramza was a friend of appellant, informed Gramza that appellant had been discharged following a drug test. Gramza's affidavit states that the entire telephone conversation lasted no more than fifteen seconds. The receptionist's disclosure to one single person, Gramza, hardly fits the definition of publicity as stated in *Killilea.* We therefore find that Reading's disclosure of appellant's discharge to Gramza did not constitute an invasion of privacy. Appellant's fourth assignment of error is overruled.

Under her fifth assignment of error, appellant argues that the trial court erred in overruling her motions to strike the affidavits of James T. Lutz, M.D. Dr. Lutz is a medical doctor authorized to practice medicine in the state of Ohio and the medical director of Mercy Business Connection ("Mercy"), which administered the drug testing of Reading's employees. On March 30, 1994, Reading filed Dr. Lutz's affidavit in support of its motion for summary judgment. On April 29, 1994, Reading filed a second affidavit by Dr. Lutz. Appellant contends that the affidavits fail to show that Dr. Lutz (1) had firsthand knowledge of the procedures followed by Mercy or by Roche Medical Laboratories with regard to appellant's urine specimen, and (2) was competent to testify on this matter pursuant to Civ.R. 56(E).

Civ.R. 56(E) sets forth the requirements for summary judgment affidavits and states that such affidavits "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

Upon a review of the challenged affidavits, we find that they meet the requirements set forth in Civ.R. 56(E). We first find that Dr. Lutz's affidavits were based upon his personal knowledge. While Dr. Lutz did not witness firsthand the procedure followed with specific regard to appellant's specimen, Dr. Lutz manages and oversees the drug-screening program performed by Mercy for employers and has personally reviewed the individual drug-screening results of appellant. Dr. Lutz's opinion was based upon this information. We further find that Dr. Lutz was competent to testify. The affidavits identify both Dr. Lutz and his relationship to Reading through his position of medical director of Mercy, which administered the drug testing of Reading's employees. The affidavits further identify the basis of his knowledge of the facts to which he attested. Appellant's fifth assignment of error is therefore overruled.

*Judgment affirmed.*

JONES, P.J., and WILLIAM W. YOUNG, J., concur.

FRED E. JONES, P.J., retired, of the Twelfth Appellate District, sitting by assignment.